# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LONDON WALLACE, by and through his guardian ad litem Lois Robinson,**<br><br>**Plaintiff**<br><br>v.<br><br>**CITY OF FRESNO, FRESNO POLICE DEPARTMENT, OFFICER CHRISTOPHER MARTINEZ, OFFICER MICHAEL AGUILAR, OFFICER PATRICK FELLER, and DOES 4 to 25, inclusive,**<br><br>**Defendants** | **CASE NO. 1:19-CV-1199 AWI SAB**<br><br>**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Doc. No. 63) |

This case arises from a confrontation between minor Plaintiff London Wallace ("Wallace") and members of the City of Fresno ("the City") Police Department ("FPD"). The active complaint is the Third Amended Complaint ("TAC"). Wallace brings claims against Defendants FPD Officers Christopher Martinez ("Martinez"), Ricardo Loza ("Loza"), Michael Aguilar ("Aguilar"), and Patrick Feller ("Feller") under 42 U.S.C. § 1983 for violations of his Fourth Amendment right to be free from excessive force, and state law claims of negligence, battery, Civil Code § 52.1 ("Bane Act"), false imprisonment, and intentional infliction of emotional distress. Currently before the Court is Defendants' motion for summary judgment. For the reasons that follow, Defendants' motion will be granted in part and denied in part.

1    **<u>SUMMARY JUDGMENT STANDARD</u>**

2    Summary judgment is proper when it is demonstrated that there exists no genuine issue as

3    to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

4    Civ. P. 56; <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Fortyune v. American Multi-</u>

5    <u>Cinema, Inc.</u>, 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears

6    the initial burden of informing the court of the basis for its motion and of identifying the portions

7    of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine

8    issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Soremekun v. Thrifty</u>

9    <u>Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome

10   of the suit under the governing law.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49

11   (1986); <u>United States v. Kapp</u>, 564 F.3d 1103, 1114 (9th Cir. 2009).  A dispute is "genuine" as to

12   a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-

13   moving party.  <u>Anderson</u>, 477 U.S. at 248; <u>Freecycle Sunnyvale v. Freecycle Network</u>, 626 F.3d

14   509, 514 (9th Cir. 2010).

15   Where the moving party will have the burden of proof on an issue at trial, the movant must

16   affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.

17   <u>Soremekun</u>, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an

18   issue at trial, the movant may prevail by presenting evidence that negates an essential element of

19   the non-moving party's claim or by merely pointing out that there is an absence of evidence to

20   support an essential element of the non-moving party's claim.  <u>See</u> <u>James River Ins. Co. v. Herbert</u>

21   <u>Schenk, P.C.</u>, 523 F.3d 915, 923 (9th Cir. 2008); <u>Soremekun</u>, 509 F.3d at 984.  If a moving party

22   fails to carry its burden of production, then "the non-moving party has no obligation to produce

23   anything, even if the non-moving party would have the ultimate burden of persuasion at trial."

24   <u>Nissan Fire & Marine Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  If the

25   moving party meets its initial burden, the burden then shifts to the opposing party to establish that

26   a genuine issue as to any material fact actually exists.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith</u>

27   <u>Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>Nissan Fire</u>, 210 F.3d at 1103.  The opposing party cannot

28   "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence

that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The opposing party's evidence is to be believed, and all justifiable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899 (9th Cir. 2010). While a "justifiable inference" need not be the most likely or the most persuasive inference, a "justifiable inference" must still be rational or reasonable. See Narayan, 616 F.3d at 899. Summary judgment may not be granted "where divergent ultimate inferences may reasonably be drawn from the undisputed facts." Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2015). Inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Fitzgerald v. El Dorado Cnty., 94 F.Supp.3d 1155, 1163 (E.D. Cal. 2015); Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002). The parties have the obligation to particularly identify material facts, and the court is not required to scour the record in search of a genuine disputed material fact. Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010). Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. Nissan Fire, 210 F.3d at 1103.

**FACTUAL BACKGROUND[1]**

On January 23, 2019, the FPD conducted a probation search of an apartment in Fresno.

---

[1] "PUMF" refers to "Plaintiff's Undisputed Material Fact," "PRUMF" refers to "Plaintiff's Response to Defendants' Undisputed Material Fact," and "DUMF" refers to "Defendants' Undisputed Material Fact."

See DUF No. 1.  The apartment had been identified by the Multi-Agency Gang Enforcement

Consortium ("MAGEC") task force as a potential gang meeting location.  See DUF No. 2.

MAGEC instituted the search of the apartment following a viewing of a Facebook Live video

depicting people in the residence passing around at least one handgun.  See id.  Wallace's brother,

Patrick Beard lived at the apartment and was on probation for felony domestic violence and was

prohibited from possessing guns.  See DUF No. 3.  The MAGEC team arrived near the apartment

within 90 minutes of seeing the Facebook Live video.  See DUF No. 4.  After a briefing of the

plan to conduct a probation search, MAGEC members went to the apartment, and Detective Cerda

ordered the residents of the apartment to exit for the purpose of a probation search.  See DUF No.

5.

As each person exited the apartment, MAGEC officers patted them down and instructed

each person to sit on the landing outside the door of the apartment.  See DUMF No. 6.  Wallace

was one of the last to leave the apartment because he had been in the back playing videogames.

See PRUMF No. 8.  Two MAGEC officers, Loza and Turner, searched Wallace after he exited the

apartment.[2]  See Feller BWC;[3] Loza Depo. 62:9-25.  After he was searched, Wallace was

instructed by Det. Cerda to go sit down, and an officer pointed along the wall.  See Wallace Depo.

50:5-19; Feller BWC; see also DUMF 12.  At the time Wallace was searched, 12 or 13 other

people were sitting outside the apartment against the wall on the landing.  PUMF No. 1.  Wallace

went towards the center of the wall where other people were seated.[4]  See Wallace Depo. 50:20-

51:3; Feller BWC; see also PRUMF 12.  FPD officers felt that the situation at the apartment was

---

[2] Defendants contend that Wallace was not initially cooperative with the pat down search and that Loza needed the help of Officer Turner to complete the search.  See DUMF No. 11.  However, Wallace testified that he cooperated with the pat down search.  See PRUMF No. 11.  As the non-moving party, the Court credits Wallace's version of events.  Narayan, 616 F.3d at 899; Blankenhorn v. City of Orange, 485 F.3d 463, 480 (9th Cir. 2007).

[3] "Feller BWC" refers to the body worn camera footage of officer Feller, which is Exhibit J to the Carpenter declaration.

[4] Defendants contend that Wallace did not follow instructions and kept walking towards Det. Cerda, who was standing at the top of a stairwell that led down to the street.  See DUMF 12.  However, Wallace cites to his deposition testimony and the bodycam video to contend that he was told where to go after he was patted down and started to go against the wall.  See PRUMF 12.  A review of the bodycam video indicates that an officer pointed where Wallace should go, and it appears as if Wallace went in that direction, which was against the wall.  See Feller BWC.  Because the Court views the evidence in the light most favorable to Wallace, DUMF 12 is not established.  Narayan, 616 F.3d at 899.

hostile, see DUMF 9; Aguilar Depo. 65:18-22 (explaining that the apartment occupants were loud and disrespectful); Loza Depo. 52:3-18 (explaining that the apartment occupants were cursing and questioning the presence of the police), and there were 12 to 13 individuals sitting on the second story landing with approximately six FPD officers on scene.  See PUMF 1.

At this point, the events are sharply disputed.  Defendants contend that Martinez took hold of Wallace's hand to direct him to the location where Det. Cerda had pointed.  See DUMF 13. Wallace then took a "fighting stance" by taking a step towards Martinez, broadening his shoulders, and cocking his arm back.  See DUMF 14.  Wallace then raised and closed his right hand towards Martinez's face.  See DUMF 15.  Martinez attempted to take Wallace to the ground, and Wallace struck Martinez in the face.  See DUMF 16.  Martinez then struck Wallace three times with a closed fist.  See DUMF 17.  Wallace pushed into Feller, and Feller grabbed Wallace in the upper chest/collarbone to assist in taking him into custody.  See DUMF 18.  Wallace then wrapped his arm around Martinez's neck while they both fell to the ground, and, once on the ground, Martinez struck Wallace's right side twice to overcome resistance and gain control of Wallace's right arm. See DUMF 19.  Once on the ground, Loza assisted Martinez by taking hold of Wallace's left arm, which was tucked under Wallace's body, while telling Wallace numerous times to give him his hand.  See DUMF 20.  Loza testified that he could feel Wallace tensing his left arm and pulling it in towards his (Wallace's) body.  See DUMF 21.  Loza tried to roll Wallace over to gain control of Wallace's left hand, but was unable to do so because of Wallace's active resistance.  See DUMF 22.  Loza then applied downward pressure on Wallace's forearm and aimed two strikes between Wallace's right ear and shoulder in an effort to gain compliance.  See id.  Aguilar assisted the other officers and with his help, the officers were able to roll Wallace onto his stomach retrieve his left hand.[5]  See DUMF 24.  Wallace was placed in handcuffs and transported to a hospital for treatment of superficial injuries.  See id.

Wallace relies on his deposition testimony and the bodycam video that was taken from Feller's bodycam.  Wallace contends that, as he was attempting to comply with Cerda's command

---

[5] Patrick Beard, Wallace's brother, attempted to push past Aguilar and join the altercation with Wallace and the officers.  See DUMF 23.  Aguilar secured Beard and then turned to see other FPD officers struggling to handcuff Wallace because Wallace's left hand was tucked under his body.  See id.

to sit down, Martinez came and grabbed him.  See PUMF 3.  Martinez rushed Wallace, grabbed him, pushed him to the wall, manhandled him, and then just started punching him.  See PUMF 4. More officers came, and Wallace told them that he did not do anything.  See PUMF 5.  The officers pulled Wallace down, and as they were telling him to get down, Wallace said, "Okay, I'm going to get down."  See id.  Two or three officers pulled Wallace to the ground, pulling on his left arm with his right arm behind his back.  PUMF 6.  Wallace was on the ground on his left side, and an officer had a knee on Wallace's head to hold him down.  See PUMF 7.  Wallace's left arm was stuck under his head and he was yelling that his arm was stuck and he could not get it out; he yelled, "I can't," when instructed to move his left arm.  See PUMF 8.  Wallace was never pushing against or pulling away from the officers while he was on the ground.  PUMF 9.  Wallace never resisted, never made an action to pull back and hit an officer, never made a fist, and never swung at an officer.  PUMF 10.  While on the ground, an officer was on Wallace's legs and another had a knee on his head; Wallace thought he felt three strikes to his nose and believed that he was elbowed in the nose.  See PUMF 11.  Loza heard Wallace say that he [Wallace] could not move his left arm in order to comply, but Loza did not believe Wallace.  See PUMF 18.  Loza testified that Wallace's left arm was tucked under Wallace's body, and that Wallace was sort of laying on his left side, but that he did not believe that this positioning prevented Wallace from moving his left arm from his under his body.  See PUMF 19.  Wallace was eventually able to pull his arm out from under him to comply with commands and was placed in handcuffs.  See PUMF 12.  Wallace was then laying on the ground trying to calm the situation.  PUMF 13.  At no time did Wallace punch an officer, did not pull back to punch an officer, and to his knowledge never made any contact with an officer with his hand.  PUMF 14.  Wallace was taken to the hospital, and he suffered a fractured nose, bruises, and scrapes on his wrists.  See PUMF's 15, 16.  Since the incident, Wallace has suffered anxiety, depression, and memory loss.  See PUMF 24.

Sgt. Escalante, who was at the apartment, investigated Martinez's use of force twice, once immediately following the use of force and the second time either as a result of a formal complaint or direction from superiors.  See Escalante Depo. 90:9-14; DUMF Nos. 25, 26.  Escalante determined that Martinez's use of force was within FPD policy.  See DUMF No. 26; PUMF No.

20.  After receiving a formal complaint from Wallace, Internal Affairs conducted its own investigation.  See DUMF No. 27.  As a result of the incident with Wallace, Martinez was suspended, demoted, and required to participate in remedial training regarding *inter alia* de-escalation techniques.  See Defoe Expert Report Opinion 7.  No other officer was disciplined.  See DUMF 27.  Wallace was informed via letter that, after investigation, the officers were exonerated.  See Carpenter Dec. Ex. L.

FPD officers are mandated by the Peace Officers Standards and Training ("POST") to train every two years in perishable skills and regularly review their use of force policy.  See DUMF 25.  The defendant officers were all trained that they are permitted to use the degree of force that is objectively reasonable under the totality of the circumstances and that they have a duty to intervene if they witness a member of law enforcement using excessive force.  See DUMF 10.


**DEFENDANTS' MOTION**

**I.**      **Fourth Amendment Claim**

*Defendants' Argument*

Defendants argue that the quantum of force used against Wallace was low-level hands-on force.  This reasonable amount of force was necessary to restrain Wallace because he continually was resisting the officers in the performance of their lawful duties.  Defendants argue that before Wallace exited the apartment, officers were in a hostile situation.  Wallace did not comply with Loza's instructions during the pat down search, and also chose to oppose lawful directives from other officers.  Wallace's non-compliance made the situation more dangerous, and even caused Wallace's brother to attempt to intervene.

With respect to Martinez, he first put his hand on Wallace's forearm, which is de minimis.  After Martinez was struck in the face by Wallace, Martinez punched Wallace to end the altercation and restore order.  Martinez punched even though he had higher level force options available to him.  Martinez continued to struggle because Wallace was resisting arrest and not complying with officers' instructions.  Wallace chose to prolong the encounter, but Martinez used a measured and appropriate amount of force.

With respect to Feller, he had only negligible involvement.  During the interaction, Wallace was pushed into Feller.  To assist taking Wallace into custody, Feller reached over and grabbed Wallace in the upper chest/collarbone to assist taking Wallace into custody.  This was a reasonable amount of force.

With respect to Loza, he touched Wallace's left forearm and struck Wallace's upper back/shoulder area.  This is a low level of force because the strikes did not subdue Wallace and Wallace continued to actively resist the officers.  Loza's actions were reasonable under the totality of the circumstances because of the danger posed by Wallace at the moment.

With respect to Aguilar, he merely assisted the officers by helping to roll Wallace onto his stomach so that the other officers could gain control of Wallace's left hand and end the situation.  This was the lowest level of force possible and was reasonable.

Finally, Wallace's version of facts is contradicted by the bodycam video.  For example, the bodycam video does not show Loza kneeling on Wallace's head or that Wallace's hand was under his torso.  Because the bodycam video contradicts Wallace's version of events, Wallace's version can be disregarded.

*Plaintiff's Opposition*

Wallace argues that summary judgment on the Fourth Amendment claim is improper.  The bodycam video in this case depicts Martinez punching Wallace multiple times in the face and head for seemingly no reason, and then shows a continued barrage of blows by another officer even though Wallace was pinned to the ground, with other officers either manhandling Wallace or just standing by and watching other officers punch Wallace.  Further, Defendants' own expert does not support the proposition that Wallace took a fighting stance, and Loza's own testimony supports the proposition that Wallace was simply trying to get his arm out from underneath him in order to comply with the officers' commands.  The bodycam video and Wallace's testimony show that he was attacked for no reason, was not resisting, was not a threat, and was not fleeing.  It is for the jury to review and the video and determine the reasonableness of the officers' use of force and failure to intervene.

1    *Legal Standards*

2       1.    Fourth Amendment Excessive Force

3      All claims that law enforcement officers used excessive force, either deadly or non-deadly,

4 in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under

5 the Fourth Amendment and its standard of objective reasonableness. See Scott v. Harris, 550 U.S.

6 372, 381-83 (2007); Graham v. Connor, 490 U.S. 386, 395 (1989). Cases that involve deadly

7 force do not fit into their own separate category with their own set of "rigid pre-conditions" that

8 must be met, rather the key is whether the officer's actions were reasonable. See Scott, 550 U.S.

9 at 382-83; Hooper v. County of San Diego, 629 F.3d 1127, 1133 (9th Cir. 2011). The pertinent

10 question in excessive force cases is whether the use of force was "objectively reasonable in light

11 of the facts and circumstances confronting [the officers], without regard to their underlying intent

12 or motivation." Graham, 490 U.S. at 397; Hooper, 629 F.3d at 1133. The objective inquiry into

13 reasonableness is highly fact specific. See Scott, 550 U.S. at 383; Wilkinson v. Torres, 610 F.3d

14 546, 551 (9th Cir. 2010). "We first assess the quantum of force used to arrest [the plaintiff]" and

15 then "measure the governmental interests at stake by evaluating a range of factors." Davis v. City

16 of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007). Factors that are considered in assessing the

17 government interests at stake include, but are not limited to, "the severity of the crime at issue,

18 whether the suspect poses an immediate threat to the safety of the officers or others, and whether

19 he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396;

20 Luchtel v. Hagemann, 623 F.3d 975, 980 (9th Cir. 2010); Davis, 478 F.3d at 1054. Where it is or

21 should be apparent that an individual is emotionally or mentally unstable, that is a factor that must

22 be considered in determining the reasonableness of the force employed. See Luchtel, 623 F.3d at

23 980; Drummond v. City of Anaheim, 343 F.3d 1052, 1058 (9th Cir. 2003). Courts also are to

24 consider whether it was feasible to give a warning before using force, and whether a warning was

25 actually given. See Bryan v. MacPherson, 630 F.3d 805, 831 (9th Cir. 2010). "In some cases . . .

26 the availability of alternative methods of capturing or subduing a suspect may be a factor to

27 consider." Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005); see Luchtel, 623 F.3d at

28 980. "[P]olice are required to consider what other tactics if any were available, and if there were

clear, reasonable, and less intrusive alternatives to the force employed that militate against finding the use of force reasonable." Nehad v. Browder, 929 F.3d 1125, 1138 (9th Cir. 2019) (internal quotations omitted). However, police officers "are not required to use the least intrusive degree of force possible" as long as the force actually used was reasonable. Forrester v. City of San Diego, 25 F.3d 804, 807 (9th Cir. 1994); see Gregory v. County of Maui, 523 F.3d 1103, 1107 (9th Cir. 2008). That is, a reasonable use of force "encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable." Wilkinson, 610 F.3d at 551. It may also be appropriate to consider the parties' "'relative culpability,' i.e. which party created the dangerous situation and which party is more innocent, may also be considered." Espinosa v. City & County of San Francisco, 598 F.3d 528, 537 (9th Cir. 2010); see Scott, 550 U.S. at 384. Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396; Wilkinson, 610 F.3d at 550. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97; Wilkinson, 610 F.3d at 550. "Force is excessive when it is greater than is reasonable under the circumstances." Santos v. Gates, 287 F.3d 846, 854 (9th Cir. 2002).

### 2.   Failure to Intervene

Law enforcement officers have a duty to intercede when fellow officers violate the constitutional rights of a suspect or other citizen. Tobias v. Arteaga, 996 F.3d 571, 583 (9th Cir. 2021); Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000). If an officer fails to intercede, that passive officer will be held liable for violating the same constitutional right that was violated by the active officer. Tobias, 996 F.3d at 584; United States v. Koon, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994).[6] Thus, "an officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights." Tobias, 996 F.3d at 584 (quoting Koon, 34 F.3d at 1447 n.25). However,

---

[6] Reversed on other grounds, 518 U.S. 81 (1996).

1   "officers can be held liable for failing to intercede only if they had an opportunity to intercede."

2   Tobias, 996 F.3d at 584; Cunningham, 229 F.3d at 1289.  Similarly, if an officer is unaware of a

3   constitutional violation as it is occurring, the unaware officer cannot be held liable.  Ramirez v.

4   Butte-Silver Bow Cnty., 298 F.3d 1022, 1029-30 (9th Cir. 2002); see also Tobias, 996 F.3d at 584.

5   Finally, if there is no underlying constitutional violation, an officer cannot be liable for failing to

6   intervene.  Greene v. City & County of San Francisco, 751 F.3d 1039, 1051 (9th Cir. 2014).

7       *Discussion*

8       1.    Martinez

9       There are several applications of force by Martinez that will be addressed separately.

10          a.    Grabbing the Arm

11      Martinez raises this use of force in his motion and classifies it as "de minimis," but

12   Wallace does not respond to this characterization or explain how Martinez's grabbing Wallace

13   itself violated the Fourth Amendment.[7]  The failure to adequately address this use of force is

14   tantamount to a non-opposition.  See Chang v. Straub Clinic & Hosp., Inc., 670 F. App'x 591, 592

15   (9th Cir. 2016); Abogados v. AT&T, Inc., 223 F.3d 932, 937 (9th Cir. 2000).  Moreover, the video

16   does not depict a significant or violent use of force by Martinez in grabbing ahold of Wallace's

17   arm.  "The grab" by Martinez is a very low level of force.  It was also an act that was done in the

18   larger context of a gang-related probation search based on a firearm being displayed on Facebook

19   Live about 90 minutes prior.  The MAGEC officers were appropriately trying to maintain order

20   and control of about 13 individuals who were in the apartment to be searched and who were loud

21   and swearing at them.  See PUMF1; DUMF No. 9; Aguilar Depo. 65:18-21; Loza Depo. 52:3-16.

22   While the Court accepts that Wallace was attempting to comply with Cerda's directives, the video

23   does not indicate an attempt at quick compliance.  See Feller BWC.  To the extent that Martinez's

24   initial grab of Wallace's arm is at issue, there is insufficient evidence to indicate that the grab was

25

26   [7] The opposition generally addresses Martinez grabbing and striking Wallace, but does not clearly differentiate
between the two uses of force.  See Doc. No. 74 at 12:21-13:5.  However, the two uses of force are very different.

27   From the bodycam video, the grabbing does appear to the Court to be a low level of force.  In contrast, and as
explained *infra*, the strikes are sudden and appear significantly more forceful. Moreover, there is a gap in time

28   between the grab and the punches.  Therefore, without more from Wallace, the Court is not satisfied that Wallace has
done enough to address Martinez grabbing Wallace.

1  an unreasonable amount of force under the totality of the circumstances.  Therefore, summary

2  judgment in favor of Martinez on this use of force is appropriate.

3                                    b.      Standing Punches

4          In terms of the relevant *Graham* considerations, Wallace was not the subject of the

5  probation search, and the officers who successfully patted-down Wallace did not indicate that he

6  was so non-compliant that Penal Code § 148 (prohibiting resisting, delaying, or obstructing a

7  peace officer in the course of his duties) would be implicated.[8]  However, the officers were out-

8  numbered by at least 2 to 1, they were conducting a probation search involving potential gang-

9  members and a firearm, and the inhabitants of the apartment were loud and critical of the officers'

10 presence.  Thus, the probation search involved a degree of danger, and the need for individuals to

11 follow officers' instructions was heightened.

12         With respect to the nature of the force, Martinez punched Wallace about three times in the

13 head.  The video depicts the punches as being sudden, forceful, and violent.  It also appears that

14 the punches may have resulted in a fractured nose and bruising.  Viewing the video in the light

15 most favorable to Wallace, the punches appear to be substantial and constitute at least a moderate

16 level of force.  See Gordon v. City & Cty. of S.F., 2021 U.S. Dist. LEXIS 225119, *27 (N.D. Cal.

17 Nov. 22, 2021) (noting that courts generally view punches to the head to be intermediate levels of

18 force); cf. Williamson v. City of National City, 23 F.4th 1146, 1151-52 (9th Cir. 2022) (holding

19 that the nature and degree of physical contact involved, as well as the risk of harm and the actual

20 harm suffered, are relevant to determining the type and amount of force used).

21         With respect to resistance and threat posed by Wallace, the parties have two very different

22 positions – Wallace contends he was following instructions when he was grabbed, punched, and

23 tackled for essentially no reason, while Martinez contends that Wallace was disobeying orders and

24 that Wallace raised his hand and actually hit him (Martinez) in the face.  Both sides rely heavily

25 on the bodycam video.  Wallace relies on the video as it appears in real time, while Defendants

26 primarily rely on individual screen shots.

27

28 [8] To the extent that Penal Code § 148 is at issue, it is generally not considered a serious or severe crime for purposes
of *Graham*/excessive force.  See Young v. County of L.A., 655 F.3d 1156, 1164 (9th Cir. 2012).

After considering the video in real time and the submitted individual screen shots, and viewing both versions of the video in the light most favorable to Wallace as the non-moving party, the Court concludes that a reasonable jury could view the video as depicting an officer who violently struck Wallace multiple times in the head for little if any reason.  Cf. Vos, 892 F.3d at 1028 ("The mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage."); Blankenhorn, 485 F.3d at 468 n.1 (drawing all reasonable inferences from a video of an encounter in the non-moving party's favor).  Martinez contends that he struck Wallace because Wallace took a fighting stance, made a fist/closed his hand, and then struck Martinez in the face.  However, the video in real time does not clearly depict this, nor can the Court say that the individual still frames definitively establish such aggressive behavior by Wallace.  While the video, particularly in real time, does show Wallace moving and his right hand raising, Wallace's actions could be viewed as him moving from the physical direction of, and momentum from, Martinez, i.e. Martinez had a hold of and was moving Wallace's arm and seems to be walking towards Wallace, thereby causing the rest of Wallace's body to follow.  It is not clear that Wallace made a fist, and it is certainly not clear that Wallace struck any part of Martinez's body, let alone his face.  Thus, the Court cannot hold as a matter of law that the video clearly contradicts Wallace or clearly establishes aggressive behavior by Wallace.  See Rice v. Morehouse, 989 F.3d 1112, 1120 (9th Cir. 2020).  Instead, for purposes of this motion, the Court views the video, as well as Wallace's testimony, as showing that Wallace was attempting to comply with instructions, was not resisting, did not take an aggressive physical stance, did not make a fist, and did not strike Martinez when Martinez punched Wallace multiple times.  See Vos, 892 F.3d at 1028; Blankenhorn, 485 F.3d at 468 n.1

From the above, while all MAGEC officers, including Martinez, were conducting a firearms and gang related search which involved a significant level of danger, Wallace was not resisting, was attempting to be compliant with commands, had been successfully patted down with no weapons found, did not hit Martinez, and did not act aggressively towards Martinez.  So viewing this evidence, a reasonable jury could conclude that Martinez violated Wallace's Fourth Amendment rights.  Therefore, summary judgment on this claim is inappropriate.

13

1                          c.      Take-Down/Holding on to Legs

2            The considerations identified above with respect to the punches generally apply to the

3    take-down and holding of Wallace's legs.  Prior to the take down, Wallace was not the subject of

4    the probation search, had been successfully patted-down, was attempting to comply with

5    instructions, did not act aggressive, and did not hit Martinez.  Viewing the evidence in the light

6    most favorable to Wallace, at the time of the take down and when Martinez was holding Wallace's

7    legs, from the video and Wallace's testimony, Wallace appeared to be passively defending himself

8    by covering his head from Martinez's use of force and trying to stay standing.  Cf. Blankenhorn,

9    485 F.3d at 480 (finding under the facts of the case that the plaintiff's resistance was reasonable

10   when he did not strike out at three officers and attempted to stay on his feet).  When he went to the

11   ground, Wallace appeared to be attempting to comply with the officers' request to give them his

12   left hand, but was unable to fully do so based on how he landed and the weight of various officers.

13   Wallace repeatedly told the officers that he could not move his left arm in response to the officers'

14   commands and actions.  Because a reasonable jury could conclude that Wallace was not actively

15   resisting, was attempting to comply but was physically unable to do so, and was not engaging in

16   any aggressive or threatening conduct, a reasonable jury could conclude that taking Wallace down

17   and holding Wallace's legs down/limiting his ability to move was unreasonable and excessive.

18   Therefore, summary judgment on this claim is inappropriate.  Cf. id. at 478-49 (finding that a

19   reasonable jury could conclude that the gang tackle at issue constituted excessive force).

20                          d.      Punches on the Ground

21           Martinez admits that he struck Wallace twice after he and Wallace fell to the ground.  See

22   DUMF 19.  Wallace does not expressly dispute this aspect of DUMF 19, but Wallace's opposition

23   also does not expressly identify the two strikes by Martinez while he was on the ground.  Martinez

24   also contends, and one of the still frames of the bodycam video shows, that Wallace had his right

25   arm around (either partially or fully) Martinez's neck.  However, the real-time bodycam footage

26   indicates sudden action.  While the footage could support a conclusion that Wallace affirmatively

27   put his arm around Martinez's neck, the footage could also show that Wallace's right arm just

28   happened to wind up near and temporarily around Martinez's neck as Wallace and the officers

went down.  Because Wallace is the non-moving party, the Court assumes the latter.  <u>Narayan</u>, 616 F.3d at 899; <u>Blankenhorn</u>, 485 F.3d at 468 n.1.  Thus, for essentially the same reasons that tackling and holding on to Wallace could reasonably be found to constitute excessive force, the two strikes by Martinez could also be found to constitute excessive force, even if the punches are considered a low level of force.  That is, Wallace had not been aggressive, had attempted to comply with Det. Cerda's instructions, did not hit Martinez, was simply trying to cover his head and stay standing, had his arm pinned underneath him, and his arm made limited/brief contact with Martinez's neck in the falling process that was initiated by the officers.  To the extent that the two "ground strikes" from Martinez are at issue, summary judgment on that use of force is improper.

       2.    <u>Feller</u>

       Feller was the officer whose bodycam captured the uses of force against Wallace.  The bodycam captures the events at such an angle that it can be reasonably inferred that Feller saw the actual use of force by Martinez against Wallace, as well as all the relevant actions and events leading up to the use of force.[9]

       The amount of force utilized by Feller is unclear.  Wallace does not expressly assert that Feller punched or struck him.  However, in Martinez's attempts to take Wallace to the ground, Martinez and Wallace tumbled into Feller.  Feller reached out and grabbed Wallace's shoulder/collarbone area, assisted in taking Wallace to the ground, and then assisted in attempting to gain control of Wallace's left arm and placing Wallace in handcuffs.

       Wallace does not specifically address Feller grabbing ahold of him on the shoulder/collarbone.   Grabbing ahold of Wallace's shoulder/collarbone appears to be a low level of force, particularly because there is no indication that Wallace suffered any harm.  Further, Wallace and Martinez tumbled directly into Feller.  From the bodycam video, it appears that Feller had just climbed stairs and was standing near the stairwell when Martinez and Wallace tumbled into him.  In the absence of Wallace directly addressing Feller grabbing him, <u>cf.</u> <u>Chang</u>, 670 F.

---

[9] The Court finds that this is a reasonable inference that the Court will make in Wallace's favor for purposes of this motion, <u>see</u> <u>Narayan</u>, 616 F.3d at 899, but not that it is an established fact for all purposes.  Depending on where the bodycam is placed on Feller's torso, and which direction Feller's head was facing, it is possible that Feller did not actually see the relevant moments when Martinez struck Wallace.

1   App'x at 592; <u>Abogados</u>, 223 F.3d at 937, considering the low level of force and Feller's position

2   near the stairwell, merely grabbing onto Wallace's shoulder/collarbone after Martinez and Wallace

3   tumbled into him was not unreasonable under the circumstances.  Summary judgment in favor of

4   Feller on this use of force is appropriate.

5          Helping to take down Wallace and utilizing force to aid in the handcuffing of Wallace

6   also appear to be relatively low levels of force, although more substantial than simply grabbing

7   ahold of him.  From Wallace's testimony and the bodycam video, Wallace had been successfully

8   patted down, was attempting to comply with Det. Cerda's directions, had not been aggressive, had

9   not hit Martinez, was punched multiple times by Martinez in the head, and the video can be

10  viewed as showing that Martinez's momentum and actions were causing or forcing Wallace to

11  move and tumble into Feller.  Viewing the evidence in the light most favorable to Wallace, the

12  video and Wallace's testimony do not indicate a reasonable basis either to strike Wallace or tackle

13  him or to use force to handcuff him.  That is, the video can be viewed as Wallace being struck,

14  battered, and taken to the ground without reason.  Therefore, a reasonable jury could conclude that

15  tackling Wallace or aiding in that tackle, as well as utilizing force in the handcuffing/detention

16  process, were excessive uses of force in violation of the Fourth Amendment.  Summary judgment

17  on these uses of force is inappropriate.

18         With respect to failing to intervene, Feller was a direct participant in the tackling of

19  Wallace and either a direct or integral participant in the force applied to Wallace while Wallace

20  was on the ground.[10]  Therefore, a failure to intervene with respect to tackling and using force to

21  handcuff Wallace while on the ground is an inapposite theory.  Further, the Court has found that

22  Martinez's initial "grabbing" of Wallace's arm did not violate the Fourth Amendment.  Because

23  Martinez's "grabbing" was constitutional, there can be no viable claim for failing to intervene

24  based on Martinez's "grabbing."  <u>See</u> <u>Greene</u>, 751 F.3d at 1051.  Finally, with respect to

25  Martinez's initial three strikes to Wallace's head, the bodycam footage shows that Martinez's

26  strikes were sudden, very fast, and without warning.  <u>See</u> Feller BWC.  In fact, the bodycam

27
28  [10] Liability under an integral participation theory is appropriate if an officer has some fundamental involvement in the conduct that caused the constitutional violation.  <u>See</u> <u>Nicholson v. City of L.A.</u>, 935 F.3d 685, 691-92 (9th Cir. 2019); <u>Blankenhorn</u>, 485 F.3d at 481 n.12.

footage shows that Martinez's punches began and finished in about two to three seconds.  See Feller BWC.  "[O]fficers can be held liable for failing to intercede only if they had an opportunity to intercede."  Tobias, 996 F.3d at 584; Cunningham, 229 F.3d at 1289.  Because the punches were sudden, without warning, and lasted only two to three seconds, neither Feller nor any MAGEC officer had the opportunity to intervene to stop Martinez's three punches.  To the extent that Wallace contends that Feller can be liable for failing to intervene to stop Martinez's initial punches, summary judgment on such a theory is appropriate.  See id.

   3.   Aguilar

   The parties provide little evidence with respect to Aguilar.  It appears that Aguilar never punched or struck Wallace and did not tackle Wallace.  Instead, it appears that after Aguilar secured Wallace's brother Beard, Aguilar went over to where Martinez, Loza, and Feller were struggling with Wallace.  Aguilar saw that Wallace's left arm was under his body and he then rolled Wallace over and freed the left arm.  Once Wallace's left arm was freed, Wallace was handcuffed.  Wallace does not dispute Aguilar's deposition or Defendants' arguments that Aguilar merely rolled Wallace over.  In the absence of Wallace specifically addressing Aguilar rolling him over, cf. Chang, 670 F. App'x at 592; Abogados, 223 F.3d at 937, the Court agrees with Aguilar that rolling was a very low level of force that was done to further handcuffing and does not appear to be a Fourth Amendment violation.

   While Wallace does not argue that the force utilized by Aguilar constituted a Fourth Amendment violation, Wallace contends that Aguilar is liable under the Fourth Amendment for failing to intervene in Martinez, Loza, and Feller's active Fourth Amendment violations.

   Unlike Feller, there is no evidence that indicates that Aguilar saw any of the initial encounter with Martinez and Wallace or Martinez's punches to Wallace's head.  In fact, Aguilar testified that he was focused on the individuals from the apartment who had been seated on the landing, he was not looking at or in the direction of Wallace and Martinez, did not see Det. Cerda instruct Wallace, did not see what initiated the scuffle between Martinez and Wallace, and did not see Martinez punch Wallace.  See Aguilar Depo. 68:18-20, 71:5-6, 87:1-4, 89:8-10.  Aguilar heard the crowd become louder, briefly looked and saw Martinez and Wallace struggling, but then

quickly had to divert his attention to stopping and securing Beard.  See id. at 70:3-20, 71:7-72:2, 73:17-74:3, 90:9-91:5; DUMF 23.  After Beard was secured, Aguilar looked back and saw what he perceived to be Wallace resisting the attempts of Martinez, Loza, and Feller to handcuff and secure him.  See Aguilar Depo. 74:22-76:6.  Aguilar then walked over to Wallace and the officers.  See Aguilar Depo. 76:13-19.  As he was walking towards Wallace and the officers, Aguilar saw Loza strike Wallace twice in the upper back/shoulder area.  See id. at 77:3-79:25.  Aguilar saw that Wallace's left hand was under Wallace, and then rolled Wallace over, thereby freeing Wallace's left hand to be cuffed.  See DUMF 24; Aguilar Depo. 77:4-14, 80:1-11, 80:24-81:24.

As has been discussed, the punches from Martinez were too quick and sudden for any officer to intervene, let alone one who did not actually see the punches.  Further, merely having a quick glance at an officer who is struggling with a suspect for unknown reasons in a hostile environment does not in and of itself indicate that there is a Fourth Amendment violation occurring.  There are a number of reasons why an officer may be struggling with an individual, many involving no unconstitutional behavior of any kind.  There is no explanation about the struggle between Martinez and Wallace that would have been so clear that Aguilar's quick glance should have alerted him to the fact that a Fourth Amendment violation was occurring.  Similarly, after Aguilar had secured Beard, he looked back and saw three officers attempting to handcuff Wallace.  Again, the Court is aware of no authority that holds that multiple officers struggling with an individual to handcuff him is sufficient to show that a Fourth Amendment violation is occurring.  While Aguilar did see Loza deliver two strikes to Wallace's shoulder as Aguilar was walking over, the strikes ended prior to Aguilar arriving.  There is no explanation concerning what about Loza's two strikes and the scene that Aguilar observed would sufficiently show that Martinez, Loza, and Feller were using excessive force or that would make Aguilar's assistance in merely rolling Wallace over and freeing Wallace's left arm inappropriate.[11]  While officers may not use non-trivial force against a suspect who is engaged in passive resistance, see Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1093 (9th Cir. 2013), under appropriate circumstances,

---

[11] Indeed, this action appears to have ended the confrontation without any further uses of force because the freed left arm was then handcuffed.  Because all other uses of force appear to have stopped upon the freeing of the left hand by Aguilar, it is unclear whether any other type of intervention by Aguilar would have been more effective.

especially those involving a possible struggle to detain and handcuff someone, officers may use physical strikes to gain compliance.[12]  E.g. Tucker v. City of Shreveport, 998 F.3d 165, 184 (5th Cir. 2021); Gordon, 2021 U.S. Dist. LEXIS 225119 at *27-*28.  Thus, the evidence expressly cited to the Court, as well as other excerpts from Aguilar's deposition,[13] show that Aguilar either did not know that a Fourth Amendment violation was occurring or did not have an opportunity to stop a Fourth Amendment violation.  As a result, Aguilar cannot be liable for a failure to intervene.  Tobias, 996 F.3d at 584; Ramirez, 298 F.3d at 1029-30.  Summary judgment in favor of Aguilar on the Fourth Amendment claims against him is appropriate.  See id.

        4.    Loza

        No party appears to dispute that Loza struck Wallace twice while on the ground.  It also appears that Loza helped tackle Wallace and attempted to handcuff and control Wallace while Wallace was on the ground.  Unlike Aguilar in which the DUMF's suggested that Aguilar did not see the relevant portions of the confrontation between Martinez and Wallace, there are no DUMF's or arguments that suggest that Loza did not see the relevant interactions and conduct between Martinez and Wallace, leading up to the take down of Wallace.  In the absence of such an indication or argument, the Court assumes that Loza witnessed all relevant interactions between Wallace and Martinez.  With this assumption, the Court's analysis of the excessive force claim against Loza is essentially the same as the analysis with respect to Feller.  That is, viewing the evidence in the light most favorable to Wallace, the video and Wallace's testimony do not indicate a reasonable basis either to strike Wallace or tackle him because the video can be viewed as Wallace being punched and taken to the ground without reason.  Therefore, a reasonable jury could conclude that tackling Wallace or aiding in that tackle, as well as striking Wallace while Wallace was on the ground, was excessive force in violation of the Fourth Amendment.

---

[12] For purposes of this motion, the Court accepts that Wallace was not actively resisting Martinez, Feller, and Loza, and was unable to comply with instructions because of his physical positioning.  Nevertheless, for Aguilar to be liable for failing to intervene, what Aguilar actually perceived is necessary to determine whether he was aware of a constitutional violation.  Simply viewing a struggle, particularly when no other facts appear to be known, is not by itself sufficient evidence that a constitutional violation is occurring, thereby triggering a duty to intervene.

[13] Some of the cited deposition excerpts are from pages that were not specifically cited by any party, but the pages generally were close to cited pages and were read by the Court to obtain further context and clarity for the pages that were expressly cited.

1  Summary judgment on this use of force (tackling and striking Wallace while he was down) is

2  inappropriate.

3         With respect to failing to intervene, Loza was a direct participant in the tackling of

4  Wallace, the struggle with Wallace, and the force applied to Wallace while on the ground.

5  Therefore, a failure to intervene with respect to tackling and using force to handcuff Wallace while

6  on the ground is an inapposite theory.  In terms of failing to intervene in Martinez's initial strikes

7  to Wallace's head, as the Court has already explained, the strikes were too sudden for any officer,

8  Loza included, to have either intervened or stopped Martinez from punching Wallace.  Further, the

9  Court has found that Martinez's initial "grabbing" of Wallace's arm did not violate the Fourth

10 Amendment.  Because Martinez's "grabbing" was constitutional, there can be no viable claim for

11 failing to intervene based on Martinez's "grabbing."  See Greene, 751 F.3d at 1051.  Therefore, to

12 the extent that Wallace contends that Loza can be liable on a failure to intervene theory, summary

13 judgment is appropriate.  See Tobias, 996 F.3d at 584; Greene, 751 F.3d at 1051; Cunningham,

14 229 F.3d at 1289.

15

16 **II.**    ***Monell* Liability**

17        *Defendant's Argument*

18        The City argues that summary judgment on the *Monell* claim is appropriate for several

19 reasons.  First, because no officer violated Wallace's constitutional rights, there can be no *Monell*

20 liability against the City.  Second, there is no evidence that the City maintains an unconstitutional

21 policy, custom, or practice.  Wallace relies on the events of this single incident to demonstrate a

22 custom or policy, but this isolated instance is insufficient.   Third, contrary to the allegations in the

23 FAC, the FPD does not fail to investigate excessive force claims, and the incident Wallace was

24 investigated immediately by an officer on the scene and later by internal affairs.  The

25 investigations exonerated all officers of using excessive force against Wallace.  Finally, there is no

26 evidence that FPD's training and supervision of the officers in this case was unreasonable.  All

27 officers knew the amount of force that could constitutionally be used and all officers knew that

28 they had a duty to intervene if they witnessed excessive force by another officer.

1      *Plaintiff's Opposition*

2           Wallace argues that the evidence is sufficient to show ratification.  FPD twice ratified the

3   conduct of the officers, including in an official letter from the FPD itself, as opposed to the

4   conclusion of a single investigating officer.  The repeated acceptance and endorsement of the

5   officers' behavior clearly demonstrates ratification.[14]

6           Wallace also argues that there is sufficient evidence to demonstrate a failure to train.  The

7   evidence indicates that this incident was caused by inadequate training regarding de-escalation.

8   The City includes no evidence regarding what their POST mandated training is or regarding

9   whether the officers were ever trained in de-escalation.  Thus, the City did not meet its initial

10  summary judgment burden.  Further, this is not a case in which a single officer was inadequately

11  trained.  All officers involved, but particularly Martinez and Loza, repeatedly punched Wallace

12  without provocation and while he was pinned on the ground.

13      *Legal Standard*

14          Municipalities are considered "persons" under 42 U.S.C. § 1983 and therefore may be

15  liable for causing a constitutional deprivation.  Monell v. Department of Soc. Servs., 436 U.S. 658,

16  690 (1978); Castro v. County of L.A., 797 F.3d 654, 670 (9th Cir. 2015).  A municipality,

17  however, "cannot be held liable solely because it employs a tortfeasor or, in other words, a

18  municipality cannot be held liable under [42 U.S.C. § 1983] under a *respondeat superior* theory."

19  Monell, 436 U.S. at 691; see Castro, 797 F.3d at 670.  Liability only attaches where the

20  municipality itself causes the constitutional violation through "execution of a government's policy

21  or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

22  represent official policy."  Monell, 436 U.S. at 694; Price v. Sery, 513 F.3d 962, 966 (9th Cir.

23

---

24  [14] Wallace argues that a lawsuit against Martinez, in which a person was asphyxiated and died, further demonstrates
    ratification/*Monell* liability.  The lawsuit is *Perez v. City of Fresno*, 1:18-cv-0127 AWI EPG, and Wallace requests
25  that the Court take judicial notice of this case.  The Court does not find that *Perez* is relevant or supports Wallace's
    theories in any way.  The facts in *Perez* are not remotely close to the facts in this case, Martinez was granted qualified
26  immunity on all federal claims alleged against him, and no *Monell* liability was found against the City.  See Perez v.
    City of Fresno, 2022 U.S Dist. LEXIS 49199 (E.D. Cal. Mar. 17, 2022).  Therefore, the Court will not consider *Perez*
27  or Martinez's actions in *Perez* for purposes of Wallace's *Monell* claims.  See Fed. Rs. Evid. 402, 403.  Because *Perez*
    and Martinez's actions in *Perez* are irrelevant, the Court will deny Wallace's request for judicial notice.  See Ruiz v.
28  City of Sonata Maria, 160 F.3d 543, 548 n.13 (9th Cir. 1998); Sun Valley Farms, LLC v. Western Veg Produce, Inc.,
    563 F.Supp.3d 668, 676 n.7 (E.D. Cal. 2021).

2008).  Municipal liability may be premised on: (1) conduct pursuant to a formal or expressly adopted official policy; (2) a longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity; (3) a decision of a decision-making official who was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (4) an official with final policymaking authority either delegating that authority to, or ratifying the decision of, a subordinate.  See Thomas v. County of Riverside, 763 F.3d 1167, 1170 (9th Cir. 2014); Price, 513 F.3d at 966.

*Discussion*

The Court has determined that Aguilar did not violate Wallace's Fourth Amendment rights.  Therefore, summary judgment in favor of the City on any *Monell* claims based on the actions of Aguilar is appropriate.  See Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Simmons v. Navajo County, 609 F.3d 1011, 1021(9th Cir. 2010); Jackson v. City of Bremerton, 268 F.3d 646, 653 (9th Cir. 2001).  Nevertheless, the Court has concluded that a reasonable jury could find that the conduct of  Martinez, Loza, and Feller violated Wallace's Fourth Amendment right to be free from excessive force.  Therefore, summary judgment in favor of the City on the basis that Wallace's constitutional rights were not violated by these three officers is improper.  Cf. id.

Apart from the argument that the absence of a constitutional violation precludes *Monell* liability, Wallace's opposition shows that there are two *Monell* theories at issue:  ratification and inadequate training.  The Court will address these theories separately.

1.   Ratification

"To show ratification, a plaintiff must show that an official with final policy-making authority ratified a subordinate's decision or action and the basis for it."  Christie v. Iopa, 176 F.3d 1231, 1239 (9th Cir. 1999). That is, ratification has been found "when the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation." Trevino v. Gates, 99 F.3d 911, 920 (9th Cir. 1996). "The policymaker must have knowledge of the constitutional violation and actually approve of it," and a "mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim."  Lytle v. Carl, 382 F.3d 978, 987

(9th Cir. 2004).  A plaintiff must show "conscious, affirmative choice to ratify the conduct in question."  Lassiter v. City of Bremerton, 556 F.3d 1049, 1055 (9th Cir. 2009).  The mere failure to discipline an employee, without more, will not establish ratification.  Clouthier v. County of Contra Costa, 591 F.3d 1232, 1253-54 (9th Cir. 2010).

Here, Wallace points out that two investigations of this matter were performed by Sgt. Escalante and the City itself told Wallace that the officers' use of force was reasonable and officers exonerated.  The Court does not find either argument persuasive.

First, with respect to the two investigations involving Sgt. Escalante, there is nothing before the Court that suggests that a sergeant in the FDP is a final policy making employee. Escalante's rank alone would clearly indicate that he is not such an employee.  Further, while there was a formal internal affairs investigation and report, there is nothing before the Court that indicates that any final policy making employee was a member of that investigation or saw any relevant evidence (particularly the videotape) that was reviewed during that investigation.

Second, the Court cannot agree that the City itself ratified the constitutional violation and the basis for that violation.  The exoneration letter is on letterhead that lists the City of Fresno Police Department and also identifies Andrew Hall as the Chief of Police.  See Carpenter Dec. Ex. L.  The letter states that a formal investigation was conducted and that the officers were exonerated, meaning that the officers' actions were not a violation of law or policy.  See id.  The letter contains a personal apology for any inconvenience and informs Wallace that he can contact Lt. Landon (the Internal Affairs Commander) for any further questions.  See id.  The letter is signed by Lydia Carrasco, a Deputy Chief.  See id.  Thus, although the letterhead includes the City FPD and Chief Hall, the letter is from and signed by a Deputy Chief.  There is no evidence that Deputy Chief Carrasco has final policy making authority, nor is there any indication that Lt. Landon has final policy making authority.  Considering that there is an apology from Deputy Chief Carrasco ("I apologize for any inconvenience . . . ."), the Court cannot hold that the letterhead alone is sufficient for a jury to find that the exoneration letter is a ratification made by either the City itself or by an employee with final policy making authority.

Additionally, Wallace contends that Martinez was disciplined for his actions against

1  Wallace during this incident.  See PRUMF 27; Defoe Expert Report Opinion 7.  While the

2  absence of discipline alone would not support a ratification theory, see Clouthier, 591 F.3d at

3  1253-54, the fact that Martinez was disciplined would tend to indicate that there was no

4  ratification.

5        In sum, because Wallace has not shown that an official with final policy making authority

6  endorsed/ratified the excessive force against Wallace by Martinez, Loza, and Feller, summary

7  judgment in favor of the City on a ratification theory is appropriate.[15]

8              2.      Inadequate Training

9        In limited circumstances, a government's failure to train may rise to the level of an official

10 policy, but municipal "culpability for a deprivation of rights is at its most tenuous where a claim

11 turns on a failure to train."  Connick v. Thompson, 563 U.S. 51, 61 (2011); Benavidez v. County

12 of San Diego, 993 F.3d 1134, 1154 (9th Cir. 2021).  A municipality's failure to train its employees

13 may create § 1983 liability where the "failure to train amounts to deliberate indifference to the

14 rights of persons with whom the [employees] come into contact."  Connick, 563 U.S. at 61; City

15 of Canton v. Harris, 489 U.S. 378, 388 (1989).  To recover for a failure to train, a plaintiff must

16 show:  (1) he was deprived of a constitutional right, (2) the municipality had a training policy that

17 "amounts to deliberate indifference to the [constitutional] rights of the persons with whom [its

18 police officers] are likely to come into contact;" and (3) his constitutional injury would have been

19 avoided had the municipality properly trained those officers.  Blankenhorn v. City of Orange, 485

20 F.3d 463, 484 (9th Cir. 2007); see Benavidez, 993 F.3d at 1153-54.  The  inadequate training must

21 have "actually caused" the deprivation of rights.  Marsh v. County of San Diego, 680 F.3d 1148,

22 1159-60 (9th Cir. 2012); Merritt v. County of Los Angeles, 875 F.2d 765, 770 (9th Cir. 1989).

23 "Deliberate indifference is a stringent standard of fault requiring proof that a municipal actor

24 disregarded a known or obvious consequence of his action."  Connick, 563 U.S. at 61; Kirkpatrick

25 v. County of Washoe, 843 F.3d 784, 794 (9th Cir. 2016); Flores v. County of L.A., 758 F.3d 1154,

26 1158 n.10 (9th Cir. 2014).  "Mere negligence in training or supervision . . . does not give rise to a

27

28 [15] Wallace also relies on the declaration of expert witness Scott DeFoe, who opines that the officers' conduct was ratified by the City.  See DeFoe Dec. ¶ 8.  However, DeFoe's opinion is an unsupported legal assertion/conclusion. See id.  Thus, DeFoe's opinion is too conclusory to create a genuine issue of material fact.  See id.

*Monell* claim."  Dougherty v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011).  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference' for purposes of failure to train."  Connick, 563 U.S. at 62; Kirkpatrick, 843 F.3d at 794; Flores, 758 F.3d at 1159.  However, although "rare," "in a narrow range of circumstances," a pattern of similar violations may not be necessary where violations of constitutional rights are patently obvious or the "highly predictable consequence" of a failure to train.  Connick, 563 U.S. at 63; Hyde v. City of Willcox, 23 F.4th 863, 874-75 (9th Cir. 2022); Kirkpatrick, 843 F.3d at 794; Flores, 758 F.3d at 1159.  Finally, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable."  City of Canton, 489 U.S. at 391; Hyde, 23 F.4th at 875; Erdman v. Cochise Cnty., 926 F.2d 877, 882-83 (9th Cir. 1991).  "[A]n inadequate training policy itself cannot be inferred from a single incident."  Hyde, 23 F.4th at 875; see Merritt, 875 F.2d at 770 ("Mere proof of a single incident of errant behavior is a clearly insufficient basis for imposing liability on the County.").

Here, Wallace does not identify any pattern of FPD officers committing similar Fourth Amendment violations.  Nor does Wallace expressly identify a wholesale failure to train on a particular subject, or expressly identify a faulty aspect of training provided, that would make a Fourth Amendment violation like the one suffered by Wallace a highly predictable consequence.  Instead, Wallace relies on the circumstances of this case and that three officers were involved in the constitutional violation.  However, "an inadequate training policy cannot be inferred from a single incident."  Hyde, 23 F.4th at 875.  Therefore, in the absence of evidence that establishes a pattern of similar violations, and in the absence of some aspect of the FPD training regimen that would make a constitutional violation highly predictable, summary judgment in favor of the City on this issue is appropriate.

## III.  Qualified Immunity

### *Defendants' Argument*

Defendants argue that they are entitled to qualified immunity.  Wallace was initially

1  detained in the course of a valid probation search.  Wallace refused to comply with lawful

2  instructions.  Considering the dangers posed by the circumstances and the failure to comply, the

3  use of force against Wallace was not clearly unreasonable.

4         *Plaintiff's Opposition*

5         Wallace argues that it does not take a law professor to know that repeatedly punching a

6  suspect who is not resisting will be considered excessive force.  The Ninth Circuit has made it

7  clear that even some resistance will often not justify the use of non-trivial force.  The officers'

8  actions in punching Wallace multiple times while he was already pinned on the ground is a

9  substantial amount of force against at best a passively resisting person.  Such conduct is

10  unconstitutional beyond debate.

11         *Legal Standard*

12         Qualified immunity applies when an official's conduct does not violate clearly established

13  statutory or constitutional rights of which a reasonable person would have known. White v. Pauly,

14  137 S. Ct. 548, 551 (2017).  Qualified immunity may apply regardless of whether the officer

15  makes a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.

16  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  Officers are entitled to qualified immunity under

17  § 1983 unless (1) the officers violate a federal a federal statutory or constitutional right, and (2) the

18  unlawfulness of their conduct was "clearly established at the time." District of Columbia v.

19  Wesby, 138 S.Ct. 577, 589 (2018); White, 137 S.Ct. at 551.  "Clearly established" means that the

20  statutory or constitutional question was "beyond debate," such that every reasonable official

21  would understand that what he is doing is unlawful. See Wesby, 138 S.Ct. at 589; Vos v. City of

22  Newport Beach, 892 F.3d 1024, 1035 (9th Cir. 2018).  This is a "demanding standard" that

23  protects "all but the plainly incompetent or those who knowingly violate the law." Wesby, 138

24  S.Ct. at 589 (citing Malley v. Briggs, 475 U.S. 335, 341 (1986)).  To be "clearly established," a

25  rule must be dictated by controlling authority or by a robust consensus of cases of persuasive

26  authority. Id.; see also Perez v. City of Roseville, 882 F.3d 843, 856-57 (9th Cir. 2018) (noting

27  that Ninth Circuit precedent is sufficient to meet the "clearly established" prong of qualified

28  immunity).  In examining whether a rule/right is clearly established, courts are to define the law to

a "high degree of specificity," and not "at a high level of generality."  Wesby, 138 S.Ct. at 590.

The key question is "whether the violative nature of the particular conduct is clearly established"

in the specific context of the case.  Vos, 892 F.3d at 1035 (quoting Mullenix v. Luna, 136 S.Ct.

305, 308 (2015)).  Although it is not necessary to identify a case that it is "directly on point,"

generally the plaintiff needs to identify a case where an officer acting under similar circumstances

was held to have violated a federal right.  Rivas-Villegas v. Cortesluna, 142 S.Ct. 4, 8 (2021);

Wesby, 138 U.S. at 577; Vos, 892 F.3d at 1035; Felarca v. Birgeneau, 891 F.3d 809, 822 (9th Cir.

2018).  Whether a constitutional right was violated is generally a question of fact for the jury,

while whether a right was clearly established is a question of law for the judge.  Morales v. Fry,

873 F.3d 817, 823 (9th Cir. 2017).

*Discussion*

1.      Martinez, Loza & Feller

Viewing the evidence in the light most favorable to Wallace and making all reasonable

inferences in his favor, the testimony of Wallace and the bodycam video are sufficient to show

that Wallace:  (1) was successfully searched and found not to have weapons, (2) was attempting to

comply with the commands of Det. Cerda, (3) did not strike or act aggressively towards Martinez

or any other officer, (4) was punched without cause, (5) was passively covering his head and

trying to stay standing; (6) was not actively resisting while on the ground, and (7) was unable to

free his left hand (and so verbalized to the officers).  The Court accepts that all FPD officers were

outnumbered and that the occupants of the apartment were loud and resentful of the officers'

presence.  However, even accepting that this was a hostile situation, the fact remains that Wallace

was compliant, not aggressive, not a threat, and not actively resisting.  Because Wallace's

testimony and the bodycam video can reasonably be viewed as demonstrating that there was no

basis to punch, tackle, or strike Wallace because Wallace was compliant, non-threatening, and

non-resistive, qualified immunity for Martinez, Loza, and Feller is improper.  See Gravelet-

Blondin, 728 F.3d at 1092-96 (holding that officers use excessive force when they use non-trivial

force on passively resisting individuals); Nelson v. City of Davis, 685 F.3d 867, 881 (9th Cir.

2012) (same); see also, Rice, 989 F.3d at 1125-26 (discussing *Gravelet-Blondin* and *Nelson*).

1        2.     <u>Aguilar</u>

2        The Court has concluded the evidence is insufficient to support an excessive force claim

3 against Aguilar.  Because Aguilar did not violate the Fourth Amendment, no further qualified

4 immunity analysis is necessary.

5

6 **IV.**     **State Law Claims**

7        **A.**     **Battery & Negligence**

8        *Parties' Arguments*

9        Defendants argue that, for the same reasons there was no Fourth Amendment violation,

10 there is no liability for state law battery and negligence claims.

11        Wallace argues that because the evidence shows that there was a Fourth Amendment

12 violation by the defendant officers, summary judgment is inappropriate.

13        *Discussion*

14        With respect to Martinez, Loza, and Feller, the Court has held that the evidence viewed in

15 Wallace's favor is sufficient to show a Fourth Amendment violation for excessive force.

16 Therefore, for the same reasons that summary judgment was denied on the Fourth Amendment

17 claim, summary judgment on the battery and negligence claim is inappropriate.

18        With respect to the battery claim against Aguilar, battery is the California state law

19 equivalent to a Fourth Amendment excessive force claim.  See <u>Johnson v. County of L.A.</u>, 340

20 F.3d 787, 794 (9th Cir. 2003); <u>Brown v. Ransweiler</u>, 171 Cal.App.4th 516, 527 (2009).  Therefore,

21 for the same reasons that summary judgment was appropriate for Aguilar on the Fourth

22 Amendment claim, summary judgment is also appropriate on the battery claim.  <u>See</u> <u>id.</u>

23        With respect to the negligence claim against Aguilar, state law negligence is broader than

24 a Fourth Amendment excessive force claim in that the pre-shooting/tactical decisions leading up to

25 the use of force may be considered.  <u>See</u> <u>Hayes v. County of San Diego</u>, 57 Cal.4th 622, 639

26 (2013).  In this case, however, there is no evidence that Aguilar engaged in negligent tactics or

27 engaged in conduct that could be considered negligent outside of the conduct that forms the basis

28 of the Fourth Amendment claim against him.  That is, the same evidence would be considered to

1    determine both the negligence and excessive force claims.  Under these circumstances, the

2    negligence and Fourth Amendment claims are identical.  Therefore, summary judgment in favor of

3    Aguilar on the negligence claim against him is appropriate.

4

5    **B.**    **Bane Act (Cal. Civ. Code § 52.1)**

6    *Parties' Arguments*

7    Defendants argue that there is insufficient evidence to support a Bane Act claim because

8    there is no evidence that any Defendant had the intent to deprive Wallace of any constitutional

9    rights.

10   Wallace argues that the excessive force committed by the officers supports his Bane Act

11   claim.  Further, the bodycam video creates a genuine dispute as to whether the officers acted in

12   reckless disregard for his rights.

13   *Discussion*

14   The Bane Act "provides a cause of action for violations of a plaintiff's state or federal civil

15   rights committed by 'threats, intimidation, or coercion.'"  Chaudhry v. City of L.A., 751 F.3d

16   1096, 1105 (9th Cir. 2014) (quoting Cal. Civ. Code § 52.1).  Constitutionally excessive force is

17   sufficient to show coercion under § 52.1.  Rodriguez v. City of L.A., 891 F.3d 776, 801-02 (9th

18   Cir. 2018); Cornell v. City & County of San Francisco, 17 Cal.App.5th 766, 799-800 (2017).

19   Further, the Bane Act requires a specific intent to violate the plaintiff's civil rights.  Reese v.

20   County of Sacramento, 888 F.3d 1030, 1043 (9th Cir. 2018); Cornell, 17 Cal.App.5th at 801-02.

21   Thus, the "elements of a Bane Act claim are essentially identical to the elements of a § 1983

22   claim, with the added requirement that the government official had a 'specific intent to violate' a

23   constitutional right."  Hughes v. Rodriguez, 31 F.4th 1211, 1224 (9th Cir. 2022).

24   With respect to Martinez, Loza, and Feller, again, viewing Wallace's testimony and the

25   bodycam video in the light most favorable to Wallace, Wallace was punched, tackled, and struck

26   for no apparent reason.  Under such circumstances, a reasonable jury could find that the actions of

27   these officers demonstrated a specific intent to violate Wallace's Fourth Amendment rights.

28   Therefore, summary judgment on this claim is inappropriate.

1    With respect to Aguilar, there is no conduct that has been identified that would constitute

2  intimidation, threat, or coercion apart from Aguilar's alleged Fourth Amendment violation.

3  However, because the Court has determined that Aguilar did not violate Wallace's Fourth

4  Amendment right against excessive force/unreasonable seizure, Aguilar did not violate any of

5  Wallace's rights through intimidation, threats, or coercion.  Therefore, summary judgment in favor

6  of Aguilar on Wallace's Bane Act claim is appropriate.  See Hughes, 31 F.4th at 1224.

7

8    **C.**    **Intentional Infliction of Emotional Distress**

9    *Parties' Arguments*

10    Defendants argue that the elements necessary to show an intentional infliction of emotional

11  distress are not present.  Being searched without a warrant, attacked, punched, and tackled are not

12  so extreme that they exceed all bounds usually tolerated in a civilized community.

13    Wallace argues that the conduct of the officers in grabbing, punching, elbowing, and

14  throwing him to the ground is extreme and outrageous.

15    *Discussion*

16    A claim for intentional infliction of emotional distress requires a plaintiff to prove *inter*

17  *alia* extreme and outrageous conduct by the defendant.  Hughes v. Pair, 46 Cal.4th 1035, 1050

18  (2009); Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965, 1001 (1993). Conduct is "extreme

19  and outrageous" when it is "so extreme as to exceed all bounds of that usually tolerated in a

20  civilized community." Hughes, 46 Cal.4th at 1050; Potter, 6 Cal.4th at 1001.

21    With respect to Martinez, Loza, and Feller, summary judgment was denied with respect to

22  the excessive force claim.  Courts have recognized that it is possible for excessive force to be so

23  outrageous that it will meet the "extreme and outrageous" element of an intentional infliction of

24  emotional distress claim.  See Blankenhorn, 485 F.3d at 487 n.17; McFarland v. City of Clovis,

25  2017 U.S. Dist. LEXIS 54616, *48 (E.D. Cal. Apr. 10, 2017) (and cases cited therein).  Again,

26  because Wallace's testimony and the bodycam video could support a finding that Wallace was

27  punched, tackled, and struck without reason, a reasonable jury could find that Martinez, Loza, and

28  Feller's conduct was "extreme and outrageous."  Summary judgment on this claim is improper.

1    With respect to Aguilar, summary judgment on the excessive force claim has been granted.

2 Moreover, there is nothing "extreme or outrageous" about rolling Wallace over so as to free

3 Wallace's left arm for handcuffing.  There is nothing to suggest that the amount of force used was

4 anything other than a low level, and this action essentially ended the encounter and all other uses

5 of force against Wallace. Thus, summary judgment in favor of Aguilar on this claim is proper.

6    **D.    False Imprisonment**

7    *Parties' Arguments*

8    Defendants argue that they were acting with lawful privilege when they used force against

9 Wallace and detained him.  As there was a lawful privilege, a false imprisonment claim must fail.

10    Wallace argues that that because there are triable issues of material fact with respect to the

11 Fourth Amendment excessive force claim, summary judgment cannot be granted on the false

12 imprisonment claim.

13    *Discussion*

14    The tort of false imprisonment is defined as the unlawful violation of the liberty of another.

15 Asgari v. City of Los Angeles, 15 Cal.4th 744, 757 (1997); Fermino v. Fedco, Inc., 7 Cal.4th 701,

16 715 (1997).  Liability for false imprisonment attaches only if confinement is without lawful

17 privilege.  Asgari, 15 Cal.4th at 757; see Young v. County of L.A., 655 F.3d 1156, 1169 (9th Cir.

18 2011).  If an officer has probable cause to arrest, a state law claim for false imprisonment fails.

19 Young, 655 F.3d at 1169-70; see O'Toole v. Superior Ct., 140 Cal.App.4th 488, 510-12 (2006).

20    With respect to Martinez, Loza, and Feller, the evidence viewed in the light most favorable

21 Wallace shows no basis to either use force against him or to tackle and detain him.  Wallace was

22 compliant, non-threatening, and non-aggressive.  Defendants have not demonstrated that probable

23 cause existed for his arrest or detention.  Therefore, Wallace's testimony and the bodycam video

24 show that Martinez, Loza, and Feller did not have a lawful privilege to detain Wallace.[16]

25 Summary judgment in favor of these Defendants on this claim is inappropriate.

26

27 [16] The Court clarifies that there is no suggestion that the general detention of Wallace and all other occupants of the apartment pursuant to a probation search was anything other than lawful.  The false imprisonment at issue in this case

28 relates to Martinez, Loza, and Feller 's use of force and struggle with Wallace, which is a detention that is different in basis and in kind from the detention that all occupants experienced during the probation search.

With respect to Aguilar, there is insufficient evidence that he was aware that Wallace had not engaged in any conduct that warranted a use of force or detention.  The only evidence of which the Court is aware indicates that Aguilar briefly saw a struggle between Wallace and Martinez and then a struggle to handcuff between Wallace and Martinez, Loza, and Feller. Aguilar did not see any of the events that led up to the struggles.  Simply seeing a person struggle with an officer or seeing officers attempting to handcuff that person, who was part of a group of occupants who were loud and resentful of the police presence, is not enough to put Aguilar on notice that an unlawful detention or use of force was occurring.  There are many reasons why an officer or multiple officers may struggle with a single individual.  Given the possible dangers that could be involved, the Court is not willing to require an officer to presume that other officers are struggling with a person without a constitutional basis.  Because the Court is unaware of anything that would have put Aguilar on notice that the actions of Martinez, Loza, and Feller were unlawful, Aguilar's assistance in the handcuffing and detention of Wallace was appropriate and thus, done with lawful privilege.  Summary judgment in favor of Aguilar on the false imprisonment claim is appropriate.

**E.    Immunity**

*Parties' Arguments*

Defendants argue that they are entitled to immunity under Cal. Gov. Code § 821.6 and § 820.2.

Wallace argues that because all of the state law claims are based upon conduct involving a violation of the Fourth Amendment, no state law immunity applies.

*Discussion*

Under Cal. Gov. Code § 820.2, "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."  Cal. Gov. Code § 820.2; Sharp v. County of Orange, 871 F.3d 901, 920 n.13 (9th Cir. 2017).  Section 820.2 immunity "applies only to policy decisions, not to operational decision . . . ."  Mendez v. County of L.A., 897 F.3d 1067, 1084 (9th Cir. 2018) (citing Caldwell v. Montoya, 10 Cal.4th 972, 981 (1995)); Sharp, 871 F.3d at

920.  The discretionary immunity of § 820.2 does not apply to deciding to arrest when there is no probable cause, nor does it apply to the application of unreasonable force in making an arrest or overcoming resistance to arrest.  Conway v. County of Toulumne, 231 Cal.App.4th 1005, 1015 (2014); see also Sharp, 871 F.3d at 902.  In this case, no policy decisions are at issue.  The conduct at issue involves decisions to use force and detain.  Therefore, immunity under § 820.2 has no application to this case.  See Mendez, 897 F.3d at 1084; Sharp, 871 F.3d at 920; Caldwell, 10 Cal.4th at 981; Conway, 231 Cal.App.4th at 1015.

Under Cal. Gov. Code § 821.6, a "public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."  Cal. Gov. Code § 821.6; Sharp, 817 F.3d at 920 n.14.  This immunity only applies to claims for malicious prosecution. Mendez, 897 F.3d at 1083; Sharp, 871 F.3d at 920-21; Sullivan v. County of L.A., 12 Cal.3d 710, 719 (1974); see also Tabares v. City of Huntington Beach, 988 F.3d 1119, 1125 n.7 (9th Cir. 2021).  Because Wallace is not pursuing a state law claim for malicious prosecution, § 821.6 has no application to this case.  See Mendez, 897 F.3d at 1083; Sharp, 871 F.3d at 920-21; Sullivan, 12 Cal.3d at 719; see also Tabares, 988 F.3d at 1125 n.7.

**V.   Punitive Damages**

*Parties' Arguments*

Defendants argue that they are entitled to summary judgment on Wallace's punitive damages claim because there is no evidence that they acted with the required evil intent.

Wallace argues that the bodycam video itself could support a finding of reckless disregard for his rights, which is sufficient to support punitive damages.

*Discussion*

For claims brought pursuant to 42 U.S.C. § 1983, a jury may award punitive damages if they find that a defendant violated a constitutional or federal right  with malice, oppression, or in reckless disregard for the federal right.  See Castro v. County of L.A., 833 F.3d 1060, 1072 (9th Cir. 2016); Moser v. McGinnis, 549 F. App'x 665, 665 (9th Cir. 2013).

Here, the Court agrees with Wallace.  His testimony and the bodycam video could support a finding that Martinez, Loza, and Feller acted with a reckless disregard of Wallace's Fourth Amendment rights.  Therefore, summary judgment in favor of these Defendants with respect to punitive damages is inappropriate.[17]

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment (Doc. No. 63) is GRANTED with respect to:

   a. all claims against Defendant Aguilar;

   b. all *Monell* claims against the City;

   c. any excessive force claim based on Defendant Martinez grabbing ahold of Wallace;

   d. any excessive force claim based on Defendant Feller grabbing Wallace's shoulder and based on a failure to intervene in Martinez's standing punches;

   e. any excessive force claim against Defendant Loza based on a failure to intervene;

   f. all state law liability through Cal. Gov. Code § 815.2 against the City for the actions of Defendant Aguilar, for Defendant Martinez's grabbing ahold of Wallace's arm, and Defendant Feller grabbing ahold of Wallace's shoulder;

2. Defendants' motion for summary judgment is otherwise DENIED.

IT IS SO ORDERED.

Dated:   June 10, 2022

_____
SENIOR  DISTRICT  JUDGE

---

[17] Because the Court has granted summary judgment to Aguilar on all claims, there is no basis for punitive damages against him.